IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MARCUS BARNES, *et al.*, | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| | ) | No. 20 C 2137 |
| v. | ) | |
| | ) | Judge Virginia M. Kendall |
| ROB JEFFREYS, | ) | |
| | ) | |
| *Defendant.* | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

Approximately 1,200 inmates imprisoned in the Illinois Department of Corrections ("IDOC") who have completed their court-ordered sentences of incarceration and are entitled to release to a community setting on mandatory supervised release ("MSR") remain in prison because they are unable to secure an approved "host site" to live while on mandatory supervised release. Title 730 ILCS 5/3-3-7(a)(7.6), a section of the Illinois Uniform Code of Corrections, prohibits an individual on mandatory supervised release for a sex offense from living "at the same address or in the same condominium unit or apartment unit or in the same condominium complex or apartment complex with another person he or she knows or reasonably should know is a convicted sex offender or has been placed on supervision for a sex offense." (hereinafter the "One-Per-Address Statute").

Plaintiff Marcus Barnes was sentenced to 12 years' imprisonment for criminal sexual assault in 2008. Upon completing his sentence, Barnes was entitled to start

1

his term of mandatory supervised release ("MSR"), a form of post-confinement monitoring intended to assist individuals transition from prison to liberty. Under the "One-Per-Address Statute" convicted sex offenders on MSR may not live in the same building as another registered sex offender. Because he was unable to secure housing which complied with the One-Per-Address Statute, Barnes spent an additional 18 months imprisoned at the Illinois Department of Corrections ("IDOC").

Barnes, and a class of similarly situated plaintiffs, challenges the constitutionality of the One-Per-Address Statute on Eighth Amendment and Fourteenth Amendment grounds. In *Murphy et al. v. Raoul et al.*, No. 1:16-cv-11471—a related case brought by the narrower class of convicted sex offenders sentenced to an indeterminate term of MSR—this Court identified a protectable liberty interest in release from prison onto MSR once eligible and awarded the class summary judgment as to their Eighth Amendment and Fourteenth Amendment equal protection claims.

Plaintiffs in the present suit move for summary judgment on all their claims against Defendant Robert Jeffreys, Director of the Illinois Department of Corrections ("IDOC"). For the following reasons, Plaintiffs' Motion for Summary Judgment (Dkt. 32) is granted as to both their Eighth Amendment (Count I) and Fourteenth Amendment equal protection claims (Count II) but denied as to their Fourteenth Amendment substantive due process claim.

## BACKGROUND

### I.    The One-Per-Address Statute

In Illinois, almost every criminal sentence includes a period of MSR following the term of imprisonment.  *See* 730 ILCS 5/5-4.5-15(c).  Authority over MSR is vested in both the IDOC and the Prisoner Review Board ("PRB").  *See Cordrey v. Prisoner Review Bd.*, 21 N.E.3d 423, 428 (Ill. 2014).  Broadly, the PRB is responsible for setting the conditions of MSR, but the IDOC assists inmates locating a suitable "host site" for residential placement.  *See id.* at 430.

The One-Per-Address Statute precludes convicted sex offenders on MSR from living "at the same address or in the same condominium unit or apartment unit in the same condominium complex or apartment complex with another person he or she knows or reasonably should know is a convicted sex offender or has been placed on supervision for a sex offense[.]"  730 ILCS 5/3-3-7(a)(7.6).  The One-Per-Address Statute is a mandatory condition, meaning neither the IDOC nor the PRB has the discretion to impose the condition.  730 ILCS 5/3-3-7(a)(7.6).  Until April 7, 2020, the IDOC interpreted the One-Per-Address Statute to prohibit sex offenders on MSR from living in the same trailer parks as other sex offenders or from living in adjacent apartment buildings.  *Id.*  (Dkt. 50 ¶ 2).  When evaluating proposed host sites, a parole agent verifies compliance with the One-Per-Address Statute.  (Dkt. 50 ¶ 1).  If a host site is denied, the offender is notified in writing of the reason for the denial and afforded the opportunity to file a grievance.  (Dkt. 50 ¶ 3). Sex offenders on MSR must register with the local police department and, in the past, local registering

agencies have occasionally refused to register sex offenders at sites which violate the One-Per-Address Statute or rearrested them for living at such locations. (Dkt. 50 ¶¶ 7–8, 10). Once a host site is approved and the sex offender moves in, a parole agent conducts monthly checks to ensure the host site remains compliant with the One-Per-Address Statute. (Dkt. 50 ¶ 5). If the parole agent determines the host site violates the One-Per-Address Statute, he provides the sex offender written notice of the need to find a new host site. (Dkt. 50 ¶ 6). The IDOC will only reincarcerate a sex offender for a violation of the One-Per-Address Statute to keep local authorities from arresting the offender on the new charge of failure to register. (Dkt. 50 ¶ 12).

When questioned at his deposition in *Murphy* as to the basis of the IDOC's previous application of the One-Per-Address Statute to trailer parks, Dion Dixon, the IDOC's Deputy Chief of Parole, did not reference any safety or rehabilitative purpose. (Dkt. 33 ¶ 1). Instead, Dixon said registering entities and the state police understood the One-Per-Address Statute to prohibit a sex offender on MSR from living in the same trailer park as another registrant. (Dkt. 33 ¶ 1; Dkt. 49 ¶ 1; Dkt. 34-6 at 3–5). Because allowing sex offenders on MSR to live in the same trailer park as another registrant might prove counterproductive or result in reincarceration, the IDOC similarly refused to permit such placements. (Dkt. 49 ¶ 1; Dkt. 34-6 at 6). Subject to the permanent injunction ordered in *Murphy*, the IDOC altered the way it interprets the One-Per-Address Statute. No. 16-cv-11471, Dkt. 161.

A study produced by the Minnesota Department of Corrections examined the impact of permitting convicted sex offenders to live "in close proximity to one

another." (Dkt. 33 ¶ 2). The report found no negative effects from such close living and, instead, identified a handful of benefits. (Dkt. 33 ¶ 2). For example, the reduced travel time between offenders affords closer supervision of registrants, more visits per registrant, and registrants tend to inform on one another for restriction violations or crimes. (Dkt. 32 ¶ 2). These findings are consistent with the deposition testimony of Bob McKelvey, the founder of NewDay Apartments. (Dkt. 33 ¶ 7).

## II.    Other Restrictions

Separate and apart from the One-Per-Address Statute, host sites for sex offenders on MSR are subject to myriad other restrictions. For example, it is a crime for child sex offenders to "knowingly reside within 500 feet of a school building" or "playground, child care institution, day care center, party day child care facility, day care home, group day care home, or a facility providing programs or services exclusively directed towards [children]." 720 ILCS 5/11-9.3(b.5), (b.10). Registered sex offenders are further restricted from living "near . . . parks, schools, day care centers, swimming pools, beaches, theaters, or any other places where minor children congregate" without preapproval by the IDOC. 730 ILCS 5/3-3-7(b-1)(12). Finally, until April 7, 2020, IDOC policy would not approve a host site with computers, routers, wi-fi access, smart TVs or other internet-related devices, where children lived or resided, or without a land-line telephone. *Murphy*, No. 16-cv-11471, Dkt. 161.

5

### III.    Housing Availability

#### A.    *NewDay Apartments*

NewDay Apartments ("NewDay"), located in Lake County, Illinois, specializes in providing compliant housing to registered sex offenders. (Dkt. 33 ¶ 3). Bob McKelvey, the founder of NewDay, views its primary purpose as keeping "communities safe by housing registrants responsibly." (Dkt. 33 ¶ 12). NewDay has a 0% recidivism rate among its registrant tenants. (Dkt. 33 ¶ 12).

NewDay currently owns eight properties which comply with the various statutory prohibitions on sex offender host sites and has plans to expand its holdings over the next three years. (Dkt. 33 ¶¶ 4, 11). NewDay contracts with the IDOC to make four of these properties available to house indigent members of the *Murphy* class otherwise unable to procure housing. (Dkt. 33 ¶ 4). Prior to the Court's Order granting preliminary injunctive relief in *Murphy*, NewDay was limited to housing a single registrant per location. (Dkt. 33 ¶ 5). NewDay also owns multi-unit properties which, under the One-Per-Address Statute, are limited to registrants off MSR. (Dkt. 33 ¶ 12). Permitting multiple registrants on MSR would "easily double" the number of units NewDay could offer and would make the housing more affordable. (Dkt. 33 ¶ 12). Several registrants have been released to NewDay on preliminary injunction. (Dkt. 68).

#### B.    *Wayside Cross Ministries*

Wayside Cross Ministries ("Wayside"), located at 215 E. New York Street, Aurora, Illinois, is a "Bible-based residential program" with over 90 years of

6

experience. (Dkt. 33 ¶ 13). Its Master's Touch Ministry program targets men struggling with drug and alcohol addiction and transitioning after a period of incarceration for sex offenses. (Dkt. 33 ¶ 13). The program takes a minimum of seven months to complete and is highly structured with a strict code of conduct. (Dkt. 33 ¶¶ 15–16). Program participants are subject to a curfew, required to attend scheduled Bible study and church services, prohibited from using drugs or alcohol, not allowed to use profane or abusive language, limited to listening to music that glorifies God, and only allowed to use technology in "a manner that conforms to God's high standards." (Dkt. 33 ¶ 16). Participants may only complete the program by successfully completing random drug and alcohol tests, actively participating in programming, and adhering to the program's rules. (Dkt. 33 ¶ 16).

Program participants live together in a dormitory and are provided free room and board. (Dkt. 33 ¶¶ 17–18). The Master's Touch Ministry program is willing to accept registrants on MSR from the IDOC and several have been admitted to the program on preliminary injunction. (Dkt. 22; Dkt. 33 ¶ 19).

### C. *Pastor James Cockrell*

James Cockrell, a pastor with Abundant Faith Ministries in Springfield, Illinois, with experience ministering to convicted sex offenders imprisoned in the IDOC, owns and oversees a house at 1611 E. Matheny Avenue, Springfield, Illinois. (Dkt. 33 ¶¶ 20–21). Cockrell intends to provide housing and supportive services to, among others, convicted sex offenders. (Dkt. 33 ¶ 21). Cockrell will offer one month rent-free and help finding employment and housing. (Dkt. 33 ¶¶ 22–23). Cockrell

7

has a relationship with a local employer open to hiring convicted sex offenders and which will provide a shuttle service to residence to and from work. (Dkt. 33 ¶ 22). Cockrell is willing to accept convicted sex offenders on MSR. (Dkt. 33 ¶ 25).

### D. *New Beginnings Recovery Homes, Inc.*

New Beginnings Recovery Homes, Inc. ("New Beginnings") is a not-for-profit that provides affordable shared transitional housing and case management services to those newly released from prison. (Dkt. 33 ¶¶ 27–28). New Beginnings targets those experiencing housing or food insecurity, lacking gainful employment, or recovering from drug or alcohol addiction and has significant experience helping convicted sex offenders successfully transition back into the community. (Dkt. 33 ¶¶ 28, 31). New Beginnings has five buildings on the south side of Chicago compliant with housing restrictions applicable to convicted sex offenders where residents live in a dormitory or semi-private shared living setting. (Dkt. 33 ¶¶ 29–30). New Beginnings residents receive meals and have access to services such as peer support groups, counseling with licensed providers, case management, and 24-hour security. (Dkt. 33 ¶¶ 29, 31). Residents must adhere to New Beginning's rules, which include a curfew, abstinence from drugs and alcohol, and no minors or women on the premises. (Dkt. 33 ¶ 32). New Beginnings is willing to accept registrants on MSR from the IDOC and several have been released to New Beginnings on preliminary injunction. (Dkt. 33 ¶ 34; Dkt. 52; Dkt. 60; Dkt. 64).

## IV. Class Members

### A. *Luis Aponte*

Luis Aponte was released from the IDOC on MSR in January 2020 to his father's home in a four-story apartment building with approximately 12 units. (Dkt. 33 ¶ 45). Aponte is doing well on MSR and has a full-time job in a warehouse and has been regularly attending his required sex offender therapy. (Dkt. 33 ¶ 47). In March 2020, another registrant off MSR moved into a different unit in the same building where Aponte's father lives. (Dkt. 33 ¶ 48). Aponte's parole agent notified him that, because the One-Per-Address Statute prohibits him from living in the same building as another registrant, he needed to find another host site or return to prison. (Dkt. 33 ¶ 48). Aponte has not been able to find alternate living accommodations and wishes to continue living with his father. (Dkt. 33 ¶ 49).

### B. *Marcus Barnes*

Marcus Barnes completed his prison sentence on December 17, 2018, at which point he was approved for release on MSR. (Dkt. 33 ¶ 35). Barnes's family identified 11 potential host sites, all of which were rejected for various reasons by the IDOC. (Dkt. 33 ¶ 35). Among the potential host sites was a building owned by Jordan's Dream, which provides transitional housing and supportive services to convicted sex offenders. (Dkt. 33 ¶ 36). The IDOC rejected this site under the One-Per-Address Statute because another registrant lived there. (Dkt. 33 ¶ 37). Barnes spent more than 18 months of "dead time" in prison after the completion of his sentence of incarceration because of his inability to find an acceptable host site. (Dkt. 33 ¶ 35).

9

Barnes was released to Jordan's Dream on April 14, 2020, on preliminary injunction. (Dkt. 11).

### C.    *Fredrick Chamblis*

Fredrick Chamblis was convicted of criminal sexual assault in 2012 and sentenced to four years' imprisonment and three-years-to-life of MSR. (Dkt. 33 ¶ 61). Chamblis completed his sentence of incarceration on January 22, 2016, at which point he was eligible for release on MSR. (Dkt. 33 ¶ 61). Chamblis could not afford independent housing and the IDOC rejected all potential residences with family members as host sites and, therefore, Chamblis was not released from the IDOC at that time. (Dkt. 33 ¶ 61). Chamblis was released on preliminary injunction to Wayside Cross Ministries on May 19, 2020, more than four years after he became eligible for MSR. (Dkt. 22; Dkt. 33 ¶ 62).

### D.    *Corey Crowe*

Corey Crowe was convicted of criminal sexual assault in 2013 and sentenced to six years' imprisonment followed by three-years-to-life of MSR. (Dkt. 33 ¶ 64). Crowe became eligible for MSR on June 5, 2018, but remained imprisoned for almost two years due to his inability to find or afford a suitable host site. (Dkt. 33 ¶ 65). Crow was released to Wayside Cross Ministries on May 19, 2020, on preliminary injunction. (Dkt. 22; Dkt. 33 ¶¶ 65–66).

### E.    *Jerry Davis*

Jerry Davis was convicted of criminal sexual assault in 2006 and sentenced to four years' imprisonment followed by thee-years-to-life MSR. (Dkt. 33 ¶ 67). Davis

became eligible for MSR on December 30, 2008, but was not released at this point because he was unable to locate a host site. (Dkt. 33 ¶ 67). In June 2016, Davis was released to Hand-n-Hand Outreach, a transitional housing provider, where he lived for a year and a half. (Dkt. 33 ¶ 68). While on MSR, Davis was employed and was enrolled in school. (Dkt. 33 ¶ 68). When Davis lost his placement at Hand-n-Hand in November 2017, he was returned to prison where he remained until he was released to NewDay in December 2019. (Dkt. 33 ¶ 68). Davis is employed in a warehouse and seeking independent housing. (Dkt. 33 ¶ 69). In total, Davis served ten years of "dead time." (Dkt. 33 ¶ 68).

### F. Ronald Garrison

Ronald Garrison was convicted of predatory criminal sexual assault in 2009 and sentenced to 12 years' imprisonment followed by three years of MSR. (Dkt. 33 ¶ 73). Garrison completed his prison sentence on March 6, 2019, at which point he became eligible for MSR but remained imprisoned because he was unable to secure a host site. (Dkt. 33 ¶ 73). With financial assistance from his mother and a friend, Garrison was released to New Beginnings on June 12, 2020, after serving 15 months' "dead time." (Dkt. 33 ¶ 73).

### G. Alvin Goldberg

Alvin Goldberg is 81-years-old and currently incarcerated at Taylorville Correctional Center. (Dkt. 33 ¶ 8). Although he completed his prison sentence on November 11, 2018, at which point he became eligible for MSR, he has been unable to secure an appropriate host site and remains imprisoned. (Dkt. 33 ¶ 8). Goldberg

is able to pay for an apartment at NewDay and is on the waiting list for a unit. (Dkt. 33 ¶ 10). Goldberg has spent more than 18 months of "dead time" in prison. (Dkt. 33 ¶ 9).

### H.    Joshua Huddleston

Joshua Huddleston was convicted of predatory criminal sexual assault in 2013 and sentenced to six years' imprisonment followed by three-years-to-life MSR. (Dkt. 33 ¶ 70). Huddleston completed his prison sentence on January 22, 2019, at which point he became entitled to MSR but remained imprisoned because he was unable to secure a host site. (Dkt. 33 ¶ 70). While Huddleston is financially able to afford housing, he does not have family who could either offer him accommodations or assist him finding housing and he was unable to search for housing, sign a lease, or set up utilities while imprisoned. (Dkt. 33 ¶ 71). Huddleston was released to New Beginnings on June 8, 2020, after spending 16 months "dead time" in prison. (Dkt. 33 ¶¶ 71–72).

### I.    J.D. Lindenmeier and Stanley Meyer

J.D. Lindenmeier and Stanley Meyer are convicted sex offenders on MSR who wish to rent an apartment together once they secure jobs. (Dkt. 33 ¶ 42). Lindenmeier and Meyer wish to share living expenses such as rent and utilities. (Dkt. 33 ¶ 42). Meyer would have trouble affording an apartment on his own. (Dkt. 33 ¶ 43).

### J.     Kevin Manson

Kevin Manson was released on MSR on May 6, 2020, to live with his aunt. (Dkt. 33 ¶¶ 50–51).  The IDOC rescinded its approval of Manson's aunt's house as a host site based on its proximity to a school.  (Dkt. 33 ¶ 51).  Because Manson was unable to pay for housing on his own, The Cook County Justice Advisory Council assisted him with financing housing at New Beginnings to which Manson was released on preliminary injunction.  (Dkt. 29; Dkt. 33 ¶ 52).

### K.     John Margarella

John Margarella completed his sentence in December 2013, at which point he was entitled to MSR.  (Dkt. 33 ¶ 58).  Because Margarella is indigent and his family could neither house him nor afford separate accommodations, Margarella remained imprisoned.  (Dkt. 33 ¶¶ 57–58).  Margarella was released on preliminary injunction to NewDay on June 23, 2020, after serving six years of "dead time."  (Dkt. 33 ¶¶ 58, 60).

### L.     Dana Monson

Dana Monson completed his sentence on March 25, 2012, at which point he was entitled to MSR.  (Dkt. 33 ¶ 54).  Monson is indigent and does not have family who can assist him with money or housing.  (Dkt. 33 ¶ 53).  On May 20, 2020, Monson was released to Wayside Cross Ministries on preliminary injunction after spending more than eight years of "dead time."  (Dkt. 22; Dkt. 33 ¶¶ 54, 56).

13

### M.    Thomas Smith

Thomas Smith was sentenced to three-years-to-life MSR and wished to live with his mother and stepfather. (Dkt. 33 ¶¶ 38–39). Smith's parents have a three-bedroom home where he would have his own bedroom and bathroom. (Dkt. 33 ¶ 39). The IDOC rejected Smith's parents' house as a host site because his stepfather was convicted of a sex offense in 1986 and the One-Per-Address Statute prohibits Smith from living in the same house as a convicted sex offender. (Dkt. 33 ¶ 40). Smith was released on preliminary injunction on September 11, 2020. (Dkt. 60).

## LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a); *see, e.g., Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 485 (7th Cir. 2019). The parties genuinely dispute a material fact when "'the evidence is such that a reasonable jury could return a verdict for the nonmoving party'." *Daugherty v. Page*, 906 F.3d 606, 609–10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party." *Skiba v. Ill. Centr. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (citation omitted). "Rule 56 'mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden

14

of proof at trial.'" *Zander v. Orlich*, 907 F.3d 956, 959 (7th Cir. 2018) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

<u>**DISCUSSION**</u>

Plaintiffs move for summary judgment on three grounds, arguing that the challenged scheme violates the Eighth Amendment (Count I) and substantive due process and equal protection under the Fourteenth Amendment (Count II). As a threshold matter, the parties dispute whether an independent civil suit under 42 U.S.C. § 1983 or a petition for a writ of habeas corpus under 28 U.S.C. § 2254 is the appropriate vehicle for these constitutional claims.

**I.      § 1984 vs. § 2254**

Defendant argues Plaintiffs' claims must be brought under § 2254 because they ultimately challenge a restriction on their post-incarceration life. (Dkt. 48 at 6); *see also Williams v. Wisconsin*, 336 F.3d 576, 579 (7th Cir. 2003) ("Challenges to conditions of confinement . . . fall under § 1983. Attacks on the fact or duration of confinement come under § 2254. For parolees . . . the 'conditions' of parole *are* the confinement."). This is the same argument raised and rejected both on motion to dismiss and summary judgment in *Murphy*. *See* 380 F. Supp. 3d at 750–52. The Court again rejects this argument.

Plaintiffs challenge neither their convictions nor their sentences, including their MSR terms. Instead, Plaintiffs challenge the procedures used in host site review. (Dkt. 24-1 ¶¶ 2, 4, 7, 95–100); *see Richmond v. Scibana*, 387 F.3d 602, 606 (7th Cir. 2004) ("[A] challenge to the rules that affect placement in community

15

confinement [shall be treated] the same way as rules that affect placement in parole systems."). The One-Per-Address Statute "in no way affects the duration, much less the fact, of confinement" and, absent the statutory limitation, "supervised release will still be in place, and it will last just as long." *Bunn v. Conley*, 309 F.3d 1002, 1007–08 (7th Cir. 2002). Even were Defendant's framing of the issue as prison versus supervised release correct, Plaintiffs' claims are nonetheless appropriate under § 1983 as they do not request early release. *Moran v. Sondalle*, 218 F.3d 647, 652 (7th Cir. 2000) (explaining that § 1983 is the appropriate vehicle for prisoners who do not demand early release but contest the procedures used to make those determinations). Plaintiffs' claims are proper under § 1983.

## II. Eighth Amendment

The Eighth Amendment restricts the government's power to punish criminal offenders, including imposing "substantive limits on what can be made criminal and punished as such." *Ingraham v. Wright*, 430 U.S. 651, 667 (1977) (citing *Robinson v. California*, 370 U.S. 660 (1962)). Criminal laws may punish conduct but may not punish status. *See generally Powell v. State of Tex.*, 392 U.S. 514 (1968); *Robinson*, 370 U.S. 660. The Eighth Amendment proscription against punishing status includes both criminalizing an individual's status itself as well as an individual's involuntary conduct otherwise inseparable from his status. *See Murphy*, 380 F. Supp. 3d at 763 (collecting cases). In Count I, Plaintiffs claim Defendant's application of the One-Per-Address Statute violates their Eighth Amendment rights because it penalizes their homeless and indigent status. (Dkt. 24-1 ¶¶ 95–98; Dkt. 32 at 30).

16

Convicted sex offenders must secure a qualifying host site at which to reside before being released on MSR and the IDOC has the discretion to approve or reject the proposed site. *See Murphy*, 380 F. Supp. 3d at 764. Indigent and homeless convicted sex offenders face a virtually insurmountable obstacle in complying with the IDOC's application of the One-Per-Address Statute. The undisputed evidence establishes Plaintiffs are indigent and their families and friends are unable to secure housing acceptable to the IDOC. (Dkt. 33 ¶¶ 8–10, 35–40, 42–43, 45–62, 64–73). Moreover, absent preliminary injunctive relief, affordable housing units and residential rehabilitative programs willing and capable of accepting sex offenders on MSR are not compliant with the IDOC's application of the One-Per-Address Statute. (Dkt. 33 ¶¶ 3–5, 11–13, 15–23, 25, 27–32, 34). As a result, Plaintiffs are imprisoned beyond the terms of their sentences. (Dkt. 33 ¶¶ 9, 35, 54, 58, 62, 65, 68, 71, 73). Plaintiffs' failure to procure an acceptable host site is involuntary conduct inseparable from their indigent or homeless status. Defendant's application of the One-Per-Address Statute constitutes cruel and unusual punishment under the Eighth Amendment.

As in *Murphy*, Defendant responds that the One-Per-Address Statute doesn't criminalize status or involuntary conduct relating to homelessness in part because "there is no criminal charge here based on the offender's mere status as homeless." (Dkt. 48 at 15–17). The Eighth Amendment addresses punishment; it is not limited to a new indictment. *C.f. Martin v. City of Boise*, 902 F.3d 1031, 1048 (9th Cir. 2018) (referring to "criminal penalties"); *Diaz v. Lampela*, 601 F. App'x 670, 675–76 (10th

17

Cir. 2015). Prolonged incarceration is a punishment under the Eighth Amendment. *See, e.g., Murphy*, 308 F. Supp. 3d at 764–65 (collecting cases). Here, Plaintiffs spent as long as 10 years in prison past their release date. (Dkt. 33 ¶ 68). The One-Per-Address Statute operates to keep indigent and homeless sex offenders incarcerated beyond their term of imprisonment and is unconstitutional under the Eighth Amendment.

Plaintiffs' motion for summary judgment on the Eighth Amendment claim (Count I) is granted.

## III. Fourteenth Amendment

### A. *Substantive Due Process*

As an initial matter, Defendant argues Plaintiffs should be precluded from moving for summary judgment on their substantive due process claim because it was not pled in the Second Amended Complaint. (Dkt. 48 at 9). Defendant is correct Count II expressly brings a claim under the equal protection clause of the Fourteenth Amendment and the Second Amended Complaint makes no mention of due process, substantive or otherwise. (Dkt. 24-1 ¶¶ 99–100). However, Plaintiffs are not required to plead legal theories and, when they do, may later alter those theories. *Chessie Logistics Co. v. Krinos Holdings, Inc.*, 867 F.3d 852, 859 (7th Cir. 2017) (citing *Vidimos, Inc. v. Laser Lab Ltd.*, 99 F.3d 217, 222 (7th Cir. 1996); *CMFG Life Ins. Co. v. RBS Sec., Inc.*, 799 F.3d 729, 743–44 (7th Cir. 2015); *Rabé v. United Air Lines, Inc.*, 636 F.3d 866, 872 (7th Cir. 2011)). Courts should not hold plaintiffs to their earlier legal theories unless the changes unreasonably harm the defendant or the case's

18

development by, for example, causing unreasonable delay or making it more "costly or difficult" to defend the case, or if the alteration amounts to a change in the factual theory. *Chessie Logistics Co.*, 867 F.3d at 859 (citing *Vidimos, Inc.*, 99 F.3d at 222; *Whitaker v. Milwaukee County*, 772 F.3d 802, 808–09 (7th Cir. 2014)).

Plaintiffs' newly added substantive due process claim does not alter the factual theory underpinning their suit. Plaintiffs' substantive due process claim alleges the One-Per-Address Statute impermissibly deprives convicted sex offenders of their liberty because it does not serve a government purpose. (Dkt. 32 at 23; Dkt. 53 at 9). This new legal theory relies upon the same facts as Plaintiffs' other claims; namely, that the One-Per-Address Statute does not serve a public safety or rehabilitative purpose. Indeed, Defendant tacitly concedes this point by arguing Plaintiffs' substantive due process claim is duplicative of their Eighth Amendment claim. (Dkt. 48 at 10–11). Nor does allowing Plaintiffs to add a substantive due process theory at this stage hinder the progress of the case or unduly burden Defendant. Defendant did not articulate any way in which allowing the substantive due process claim to proceed disadvantages him and the Court can identify none.

However, Plaintiffs' substantive due process claim is duplicative of their Eighth Amendment claim. Despite Plaintiffs' attempts to distinguish these causes of action based on the cross-section of convicted sex offenders to which they apply, both allege the One-Per-Address Statute acts to keep convicted sex offenders incarcerated beyond their terms of imprisonment. (Dkt. 53 at 8). While the Fourteenth Amendment and Eighth Amendment both limit the government's authority to confine

19

a person, they are temporally distinct. *See Kingsley v. Hendrickson*, 576 U.S. 389, 400–01 (2015). Although it is uncertain which applies to hybrid forms of detention, like that at issue in the present suit, the Seventh Circuit analyzes instances of inmates incarcerated beyond their release date under the Eighth Amendment. *See, e.g., Murphy*, 380 F. Supp. 3d at 765 (collecting cases). Regardless, "the Eighth Amendment standard . . . is at least as difficult for a plaintiff to satisfy as the Fourteenth Amendment standard." *Estate of Clark v. Walker*, 865 F.3d 544, 546 n.1 (7th Cir. 2017), *cert denied*, 138 S. Ct. 1285 (2018).

Based on this understanding, the Court follows the Justices' admonition that "[w]here a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims.'" *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)); *see Graham*, 490 U.S. at 395 n.10 ("After conviction, the Eighth Amendment 'serves as the primary source of substantive protection . . .' Any protection that 'substantive due process' affords convicted prisoners against excessive force is, we have held, at best redundant of that provided by the Eighth Amendment.") (citing *Whitley v. Albers*, 475 U.S. 312, 327 (1986)). Because of this analytical redundancy, Plaintiffs' claim is appropriately brought under the Eighth Amendment, not the Fourteenth Amendment.

20

### B.     Equal Protection

The equal protection clause of the Fourteenth Amendment prohibits the government from treating similarly situated persons differently. While a prisoner's indigence does not generally call for equal protection analysis, the Supreme Court has at least twice invalidated facially neutral criminal laws that authorized the detention of poor individuals because of their indigence. *See Tate v. Short*, 401 U.S. 395, 397–99 (1971); *Williams v. Illinois*, 399 U.S. 235, 241–42 (1970). Plaintiffs' Fourteenth Amendment claim is analyzed under the standard of scrutiny articulated in *Turner v. Safley*. 482 U.S. 78, 89–91 (1987); *see, e.g., Murphy*, 380 F. Supp. 3d at 752–54 ("Custody determinations, to the extent they fall within the ambit of the Fourteenth Amendment, come under the scope of *Turner* because they lie at the core of running a correctional system.") (internal citations omitted). *Turner* holds that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89. In applying the *Turner* standard, courts consider (1) "whether there is a valid, rational connection between the regulation and the legitimate governmental interest put forward to justify it"; (2) whether alternative means of exercising the burdened constitutional right are available; (3) the impact accommodation of the asserted constitutional right will have on "the allocation of prison resources"; and (4) "the existence or absence of ready alternatives" to the challenged restriction. *Turner*, 482 U.S. at 89–91. Although all four factors are important, "the first one can act as a threshold factor regardless which way it cuts." *Riker v. Lemmon*, 798 F.3d

546, 553 (7th Cir. 2015) (quoting *Singer v. Raemisch*, 593 F.3d 529, 534 (7th Cir. 2010)).

As in *Murphy*, Defendant suggests the One-Per-Address Statute does not implicate the equal protection clause because it does not obligate Plaintiffs to pay a fee directly to the State. (Dkt. 48 at 14–15). However, the relevant question is whether indigent and homeless sex offenders remain incarcerated while non-indigent and non-homeless sex offenders are not solely because the former cannot afford housing outside prison while the latter can. *See, e.g., Murphy*, 380 F. Supp. 3d at 755. Plaintiffs maintain this is the case and, as applied, the One-Per-Address Statute treats wealthy sex offenders differently from those who are poor.

On its face, the One-Per-Address Statute applies equally to all convicted sex offenders. As applied, however, the opportunity for indigent or homeless sex offenders to procure release from confinement upon completing their term of incarceration is virtually nonexistent. As the undisputed and material evidence demonstrates, only those sex offenders with access to funds to pay for their own accommodations at an approved location will be free from incarceration. To illustrate, Fredrick Chamblis completed his sentence of incarceration for criminal sexual assault on January 22, 2016, and became eligible for release on MSR. (Dkt. 33 ¶ 61). The IDOC rejected Chamblis's family members' residences as host sites and, because Chamblis could not independently afford housing, he remained imprisoned for more than four additional years until released on MSR on preliminary injunction. (Dkt. 22; Dkt. 33 ¶ 62). Similarly, Corey Crowe became eligible for MSR

22

on June 5, 2018, but was unable to locate or afford appropriate housing. (Dkt. 33 ¶ 65). Crowe remained imprisoned for almost two more years until released on MSR on preliminary injunction. (Dkt. 22; Dkt. 33 ¶¶ 65–66). John Margarella became eligible for MSR in December 2013 but, due to indigency and his family's inability to either house or financially support him, remained imprisoned for a further six years until released on MSR on preliminary injunction. (Dkt. 33 ¶¶ 57–58, 60). Finally, Dana Monson completed his sentence of incarceration on March 25, 2012, and became entitled to MSR. (Dkt. 33 ¶ 54). However, Monson is indigent and does not have family capable of providing him housing or financial support. (Dkt. 33 ¶ 53). As a result, Monson spend more than eight years in prison after he became eligible for MSR until he was released on preliminary injunction on May 20, 2020. (Dkt. 22; Dkt. 33 ¶¶ 54, 56).

Plaintiffs' periods of post-sentence incarceration were not a consequence of their underlying offense but of their indigent or homeless status, a condition wholly beyond their control. Defendant's argument that the IDOC's requirements that sex offenders have a stable host site (applied collectively through statute, regulation, and policy) is rationally related to protecting the public, especially children, misses the point. In the equal protection context, the relevant inquiry is whether the government's separate and discriminatory treatment of similarly situated individuals rationally relates to a legitimate penological interest.

Defendants point to no legitimate government interest, such as public safety or rehabilitation, in creating separate consequences for indigent, homeless sex

23

offenders and non-indigent, non-homeless sex offenders. "[I]ndigency . . . is itself no threat to the safety or welfare of society" and Defendant's application of the One-Per-Address Statute to keep indigent and homeless sex offenders incarcerated while non-indigent and non-homeless sex offenders are released on MSR is not rationally related to public protection. *Bearden v. Georgia*, 461 U.S. 660, 669 n. 9 (1983). There is no meaningful penological distinction between indigent and non-indigent sex offenders: the state's public safety objective is constant. A homeless or indigent sex offender presumably poses the same risk to the community as one capable of affording housing and Defendant does not suggest the contrary. A Minnesota study suggests permitting registrants to live together reduces recidivism and improves supervision, findings consistent with McKelvey's anecdotal experience. (Dkt. 33 ¶¶ 2, 7). Even without the One-Per-Address Statute, the IDOC retains the ability to carefully vet potential host sites and registrants will still be subject to the multitude requirements of MSR. *See* 730 ILCS 5/3-3-7(a), (b-1)(1)–(18). The host sites at which Plaintiffs which to reside comply with all other restrictions under Illinois law and IDOC policy and several separately offer a highly structured environment with strict rules for residents. (Dkt. 33 ¶¶ 12, 14–16, 31–32, 36). Defendants offer no evidence to the contrary. The first *Turner* factor, then, favors invalidating this practice.

So, too, does the second *Turner* factor. Plaintiffs lack an alternative means of exercising their constitutionally protected liberty interest. The IDOC's application of the One-Per-Address Statute deprives indigent and homeless sex offenders of conditional liberty on MSR.

24

Plaintiffs argue on reply that accommodating the right will actually have a positive effect on prison resources. (Dkt. 53 ¶ 19). In 2019, the average annual cost of keeping a person incarcerated in an IDOC facility was $30,419. *See* Illinois Dept. of Corrections, Fiscal Year 2019 Annual Report, 101, available at https://www2.illinois.gov/idoc/reportsandstatistics/Documents/Annual%20Report%20FY19.pdf (last visited Feb. 26, 2021); *see also* Fed. R. Evid. 201(b)(2) ("The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."). By comparison, "the average cost to the State of supervising a parolee on release in the community is approximately $2,000/year." (Dkt. 53 at 14) (citing *Murphy*, 380 F. Supp. 3d at 749). Accommodating the right will positively impact prison resources. The third *Turner* factor weighs in favor of Plaintiffs' position.

Alternative, constitutional methods are already in place to effectuate the Illinois Legislature's compelling state interest in public safety. Even without the One-Per-Address Statute, the IDOC retains the discretion to deny release to host sites deemed unsafe or likely to impede the sex offender's rehabilitation. *See* 730 ILCS 5/3-3-7(b-1)(1) ("[Registered] sex offenders . . . may be required by the [IDOC] to . . . reside only at a Department approved location[.]"); 730 ILCS 5/3-3-7(b-1)(15) ("[Registered] sex offenders . . . may be required by the [IDOC] to . . . comply with all other special conditions that the Department may impose that restrict that person from high-risk situations and limit access to potential victims."). Moreover, Illinois

law already severely circumscribes where convicted sex offenders may live. *See* 720 ILCS 5/11-9.3(b.5) (prohibiting child sex offenders from "knowingly resid[ing] within 500 feet of a school building"); 720 ILCS 5/11-9.3(b.10) (prohibiting child sex offenders from "knowingly resid[ing] within 500 feet of a playground, child care institution, day care center, party day child care facility, day care home, group day care home, or a facility providing programs or services exclusively directed towards [children]"); 730 ILCS 5/3-3-7(b-1)(12) (prohibiting registered sex offenders from living "near . . . parks, schools, day care centers, swimming pools, beaches, theaters, or any other places where minor children congregate" without preapproval by the IDOC). Finally, the other conditions of MSR continue to apply to Plaintiffs and the IDOC may impose others deemed necessary to promote community safety and rehabilitation. *See* 730 ILCS 5/3-3-7(a), (b)(1)–(18). The final *Turner* factor favors invalidating the One-Per-Address Statute.

Defendant's application of the One-Per-Address Statute creates an illegal classification based on wealth which deprives Plaintiffs of their liberty as a result of their inability to pay. Nothing in this opinion should be construed to entitle Plaintiffs to release—immediate or otherwise. The Court merely holds that Defendant currently applies the One-Per-Address Statute in an unconstitutional fashion.

Plaintiffs' motion for summary judgment on their equal protection claim (Count II) is granted.

**<u>CONCLUSION</u>**

For the foregoing reasons, Plaintiffs' motion for summary judgment is granted with respect to their Eighth Amendment (Count I) and Fourteenth Amendment equal protection claims (Count II) but is denied with respect to their substantive due process claim. Although the Court today decides liability, it reserves ruling on the proper remedy to afford the plaintiffs. A status hearing will follow to discuss the need for a remedial hearing to determine the scope of equitable relief.

Virginia M. Kendall
United States District Judge

Date: March 26, 2021